### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                No. CR 20-1693 DHU

GABRIEL JACOBO-ROSAS,

     Defendant.

### MEMORANDUM OPINION AND ORDER
### ON MOTION TO SUPPRESS

This matter is before the Court on Defendant's Opposed Motion to Suppress. Def.'s Mot., Doc. 93. The Court held a hearing on the motion on May 26, 2022. Having considered the motion, briefs, record evidence, arguments, relevant law, and being otherwise fully informed, the Court concludes that the motion is **GRANTED IN PART AND DENIED IN PART**.

### I.
### FACTUAL FINDINGS

The Court makes the following findings of fact, as supported by the record, in accordance with Rule 12(d) of the Federal Rules of Criminal Procedure.[1] The Court makes additional findings of fact as needed in subsequent sections of this Memorandum Opinion and Order.

#### Officer Martinez Encounters Defendant's Chrysler

On the night of October 31, 2019, Officer Brandon Martinez was on duty in Santa Fe, New Mexico. *See* Mot. Hr'g Tr. at 18:13-20. At approximately 9:25 p.m. Officer Martinez "observed"

---

[1] At the hearing on this motion, the Court heard the testimony of Officer Brandon Martinez and Officer Erasmo Montijo, both of the Santa Fe Police Department, and Fedelina Armijo, Bureau Chief of the Financial Responsibilities Section at the Motor Vehicle Division of New Mexico. Brandon Martinez is now a Detective at the Santa Fe Police Department. *See* Motion Hearing Transcript ("Mot. Hr'g Tr.") at 17:12-21 (on file with the Court). Because he was a patrol officer at the time of the underlying facts in this matter, *see id.*, the Court refers to him as "Officer" Martinez for purposes of this Memorandum Opinion and Order.

a 2012 White Chrysler 300 traveling on Cerrillos Road near Second Street.[2]  Officer Martinez's

Report, Government's Exhibit 1 ("Govt.'s Ex.").  When Officer Martinez first encountered the

Chrysler, the officer's patrol vehicle was in the left lane and the Chrysler was slightly ahead in the

right lane.  *See* Drawing by Officer Martinez, Govt.'s Ex. 9; Mot. Hr'g Tr. at 20-21.  Officer

Martinez used an application on the computer in his police vehicle to inquire whether the

Chrysler's registration was valid through the National Crime Information Center ("NCIC").  *See*

Mot. Hr'g Tr. at 23:10-25-24:1-9.  The results came back in about five seconds.[3]  *See id.* at 23:19-

24.  The results showed the Chrysler's registration was suspended.  *See id.* at 24:3-9; Officer

Martinez's Inquiry, Govt.'s Ex. 4.

Once Officer Martinez believed the registration was suspended based on the NCIC report,

he decided to conduct a traffic stop due to the suspension.  *See* Mot. Hr'g Tr. at 26:16-20.  As his

vehicle was about parallel with the Chrysler, the officer began slowing down so he could get

behind the Chrysler.  *See id.* at 27:11-19.  The Chrysler also began slowing down.  *See id.* at 27:19-

25.  Officer Martinez slowed down to about "five miles an hour" and Defendant also slowed to

"five miles an hour."  Officer Montijo's Bodyworn Camera Footage, Govt.'s Ex. 2, at 00:00:04,

(Officer Martinez describing speed of vehicles to Officer Montijo).  Then, the Chrysler turned

right onto Navajo Drive.  *See* Mot. Hr'g Tr. at 28:3-9.  Officer Martinez did not activate his patrol

vehicle's lights or sirens at that time.  *See id.* at 31:2-3-17; 66:23-25-67:1-5.

After the Chrysler turned right onto Navajo Drive, Officer Martinez turned around "at the

next closest U-turn" on Cerrillos Road and then turned onto Navajo Drive to locate Defendant.  *Id*.

---

[2] The Court does not have Officer Martinez's body camera video of the traffic stop of Defendant because it did not
turn on until Officer Martinez was issuing citations later in the stop.  *See* Mot. Hr'g Tr. at 35:10-13.

[3] There is a discrepancy between the timestamps on the NCIC report and Officer Martinez's testimony regarding what
time he ran the NCIC report.  *See* Mot. Hr'g Tr. at 77:4-25-78:1-16. Without more information about the accuracy of
the timestamps on the NCIC report, the Court cannot conclude that the NCIC timestamps trump Officer Martinez's
memory of this sequence of events.

at 29:8-19.  He reached the U-turn spot a couple of seconds after Defendant "passed" him.[4]  *Id.*

When he did not see Defendant on Navajo Drive, Officer Martinez took three turns, driving faster

than five miles per hour, before he saw taillights traveling southbound on Monterrey Drive.  *See*

*id.* at 30:3-18; Dash Camera Footage, Govt.'s Ex. 10, at 00:18-01:32.  The officer had not yet

activated his lights or sirens.  *See* Mot. Hr'g Tr. at 31:2-3-17.  When he got closer, he recognized

the Chrysler and then noticed the vehicle's brake lights turn off and the vehicle was put in park on

the side of the road.  *See id*. at 30:21-25-31:1-5.  As Officer Martinez approached Defendant's

vehicle, Defendant was exiting the vehicle and removing his dog from the backseat.  *See* Govt.'s

Ex. 10 at 01:37-01:46. Officer Martinez initiated his emergency lights and sirens and ordered

Defendant to get back inside the vehicle, which Defendant did.  *See id.* at 01:37-02:18; Mot. Hr'g

Tr. 31:14-18.

At 9:28 p.m., Officer Martinez told the police dispatch that he was at the traffic stop of

Defendant.  *See* Computer Aided Dispatch Report, Def.'s Ex. A; Mot. Hr'g Tr. at 75:10-25-76:1-

3.  Officer Martinez asked dispatch for a backup officer.  *See* Mot. Hr'g Tr. at 78:17-25-79:1-5;

99:6-8.  Officer Martinez requested a backup officer because Defendant had a dog.  *See* Govt.'s

Ex. 2 at 00:10:00-10:32 (Officer Martinez explaining to Officer Montijo that the dog seemed

friendly but did not have a leash, so "that's why I wanted another officer.").[5]

---

[4] The Court infers that "passed" refers to the time when Defendant turned right onto Navajo Drive, as there was no testimony that Defendant physically passed Officer Martinez's patrol vehicle.

[5] The Court does not credit Officer Martinez's hearing testimony that he called for backup because he believed Defendant was acting evasively.  *See* Mot. Hr'g Tr. at 33:11-25-34:1-2.  The Court finds that his statements on the night of the incident to his fellow officer are more reliable because they were said much closer in time to the incident in the heat of the moment and comport with Officer Montijo's description of what occurs when a backup officer is called.  Officer Montijo explained that when a backup officer arrives on scene typically, the initial officer informs the backup officer of the "situation" and "let[s] [the backup officer know] why [the initial officer] asked for somebody else."  *Id.* at 131:15-21.  Here, Officer Martinez told Officer Montijo on scene that he called for backup because of the dog.  *See* Govt.'s Ex. 2 at 00:10:00-10:32.

**Traffic Stop: Officer Martinez Speaks with Defendant for About Four Minutes**

After Defendant got back inside the Chrysler, Officer Martinez approached Defendant's vehicle, where he stood speaking to Defendant for about four minutes.[6] *See* Def.'s Ex. A at 02:30-6:35. He asked Defendant what he was doing in the neighborhood, twice, and where he was taking the dog. *See* Mot. Hr'g Tr. at 35:2-4, 22-25; 92-94. Defendant stated that he was taking his dog to a family member's house, but when Officer Martinez questioned him about the address, which was in a different part of town, Defendant admitted he turned off of Cerrillos Road because he did not want to be pulled over. *See id.* at 35:22-25-36:1-8.

Officer Martinez asked for his license, registration, and insurance, and Defendant provided a Chihuahua driver's license[7] and an insurance document. *See* Martinez Police Report, Govt.'s Ex. 1, at 1. At this point Officer Martinez believed Defendant's name was "Jose Valdez" because that was the name on the insurance and license documents. *Id. at* 36:15-19; Govt.'s Ex. 1 at 1. The Chrysler was not registered to "Jose Valdez." Mot. Hr'g Tr. at 36:20-22. Defendant did not have proof of registration, *see id.* at 36:15-19, though he spent some time looking for the registration card. *See id.* at 95:2-3. Officer Martinez asked Defendant about his Mexican driver's license and how long Defendant had been living in the United States. *See id.* at 94:15-25-95:1. Officer Martinez noticed that Defendant had red eyes and had a single, closed can of beer in the vehicle, so he asked Defendant if he had been drinking that night. *See id.* at 95:4-12; Govt.'s Ex.

---

[6] Officer Martinez spoke to Defendant in English throughout the traffic stop. *See* Govt.'s Ex. 2. Though Defendant's language skills do not seem to be an issue in this case, the Court notes from its own observation of the video evidence that Defendant appeared more comfortable speaking in Spanish, which is what he did once bilingual Officer Montijo arrived on scene. Officer Montijo described Defendant's English as "very broken." *Id.* at 152:23-25. Officer Martinez's testimony that Defendant was "very fluent in English," *id.* at 55:11-16, is contrary to the video evidence and Officer Montijo's more credible observation.

[7] Though Officer Martinez testified that Defendant provided an identification card, the Court finds that Defendant provided a Chihuahua driver's license because that is what Officer Martinez noted in his report, which he completed much closer in time to the traffic stop.

2 at 01:21 (describing red eyes and unopened beer).  After standing beside the driver side window
and speaking with Defendant for about four minutes, Officer Martinez returned to his patrol car.
*See* Def.'s Ex. A at 06:37.

### Officer Martinez Waits for Backup for about Five Minutes

For about five minutes, Officer Martinez sat in his patrol vehicle alone. *See* Def.'s Ex. A
at 06:45-11:15;[8] Mot. Hr'g Tr. 101:2-5.  He began writing traffic citations, but he was waiting to
complete the process of issuing traffic citations to Defendant until the backup officer arrived.  *See*
Mot. Hr'g Tr. at 99:12-15.

### Officers Discuss Stop and Strategize About Investigating
### Contents of Chrysler for Eleven Minutes

At approximately 9:45 pm, Officer Montijo arrived on scene.  *See* Govt.'s Ex. 2 at 00:00
(timestamp reads "21:45:11");[9] Mot. Hr'g Tr 146:3-19.  When Officer Montijo arrived, Defendant
was in the Chrysler and Martinez was in his patrol car.  *See* Govt.'s Ex. 2 at 00:05; Mot Hr'g Tr.
129:4-8.  From about 9:45 p.m. to 9:56 p.m., Officer Montijo stood next to Officer Martinez's car
and talked to Officer Martinez through the open patrol car window. *See* Govt.'s Ex. 2 at 00:00-
10:55.

For about the first minute of their discussion, Officer Martinez described his initial
encounter with the Chrysler that evening.  *See id.* at 00:00-00:45.  At 9:46 p.m. Officer Martinez
told Officer Montijo he was going to write up some citations and "while I do that, I'm gonna have

---

[8] Officer Martinez testified that it is possible to see when Officer Montijo arrived because in the dash camera footage
the Chrysler's mirror became illuminated, which the Court observed occurring about four and a half minutes after
Officer Martinez returned to his patrol car.  *See* Govt.'s Ex. 10 at 11:10-11:15.

[9] To guide its timeline of events, the Court uses the timestamps contained in Montijo's Body Worn Camera Footage.
*See* Govt.'s Ex. 2.  The Court finds that the time printed on the video appears reliable because it corresponds with the
other evidence that Officer Montijo, a generally credible witness, relied on.  *See* Def.'s Ex. A; *see also* Mot. Hr'g Tr.
146:6-24 (Officer Montijo relying on times noted in Computer Aided Dispatch Report, Def.'s Ex. A).

him step out, and see if I can get into his car, see if he's hiding anything." *Id.* at 00:45-00:49.[10]

Officer Montijo then explained that he had pulled Defendant over recently, conducted field sobriety tests, and a young woman came to drive his car because Defendant did not have a license. *See id.* at 01:06-1:50.  Officer Martinez described that, on the instant stop, Defendant had red eyes and an unopened beer in his car.  *See id.* at 01:21.  Officer Martinez observed he was "not smelling anything, but I just want to get in there."  *Id.* at 01:27.  He noted, "Other than him not having a license, he has everything else."  *Id.* at 01:32.  Officer Montijo observed Defendant was driving a different "really nice" car during the previous stop, perhaps a Jaguar or a Maserati.  *Id.* at 01:35. Martinez responded, "that makes me want to get into this car even more."  *Id.* at 1:42-1:44.  Officer Montijo said there was something "odd" about Defendant's registration last time because it was registered to his "kid."  *Id.*  Officer Montijo asked Officer Martinez why he pulled Defendant over and Officer Martinez said it was because of the suspended registration.  *Id.* at 02:41-02:43.

Then, for about a minute, the officers discussed a different traffic stop of an unrelated person.  *See id.* at 04:00-04:45.  Officer Martinez recounted what Defendant had said about not wanting to be pulled over.  *See id.* at 05:00-05:16.  The officer went on to discuss Mexican identification cards  and prior experiences with an unrelated person's card.  *See id.* at 5:51-6:36.

Officer Montijo then described his prior stop of Defendant: "He wasn't drunk that time. He smelled, and he had blood shot eyes."  *Id.* at 6:52-6:59.  In response, Officer Martinez said "Wanna go talk to him?...actually you know what?  You can talk with him while I'm in the car. See if you get anything."  *Id.* at 6:59-7:04.  The officers then discussed their patrol schedule.  *See*

---

[10] The Court relies on its own, repeated, review of the audio and video in Government's Exhibit 2, as opposed to the transcript of the same.  *See* Govt.'s Ex. 7.  The Court noted a number of inconsistencies and inaccuracies in the transcript as compared to the video, and in addition, the Government has asked that the Court rely on the video as the best evidence and use the transcript merely as a demonstrative aid.  *See* Mot. Hr'g Tr. 180:4-8.

*id.* at 7:54-8:19.   Officer  Martinez said, "Now that I've been getting into all this shit, I care about getting into the car" and, "If I can get away with not writing citations, I would."  *Id.* at 8:20.   But Officer Montijo cautioned, "You're wanting to be able to document that you're actually pulling over to ticket them if there's an infraction."  *Id.* at 8:39.   From 9:54 p.m. to 9:55pm, the officers discussed gloves.  *See id.*  at 8:46-9:47.

At 9:55 p.m., approximately 25 minutes after Officer Martinez initiated the traffic stop, Officer Martinez completed the traffic citations.  *See id.*  at 10:00.  Officer Martinez then said, "So I'm gonna have him step out and I'm gonna have him get his dog."  *Id.* at 10:00-10:08.  He went on, "I could tow this car but it could backfire if he doesn't let me in though.  When I could've just towed the car."  *Id.* at 10:45-10:52.   Officer Montjio responded, "And then you can do that inventory."  *Id.*  At 9:56 p.m., the officers approached Defendant's vehicle.  *See id.* at 10:59.

### Officers Direct Defendant to Exit Chrysler with his Dog

At 9:56 p.m. the officers stood next to Defendant's vehicle. *See id.*  His window was rolled down, and he greeted the officers in Spanish.  *See id.* at 11:08.  Officer Martinez said, "Do you mind grabbing your dog and stepping back here to my car real quick?"  *Id.* at 11:14-11:24. Defendant readily agreed.[11]  Defendant and Officer Montijo discussed the dog, and the dog was let out of the car and roamed around the area.  *See id.* at 11:46-13:48.

### Officer Martinez Issues Citations

At 9:59 p.m., about 30 minutes after the traffic stop was initiated, Officer Martinez explained Defendant was getting two citations: one for "no driver's license" and one for "registration."  *Id.* at 13:50-59.  Officer Martinez instructed Defendant to sign the citations, walked

---

[11] From this point forward, most of Defendant's statements to the officers were in Spanish, with Officer Montijo interpreting for Officer Martinez.  *See* Govt.'s Ex. 2.

back to his patrol car to check the date Defendant would have to appear in court, and returned to where Defendant and Officer Montijo were standing. *See id.* at 14:10-15:43.

### Officers Request Consent to Search Vehicle

At 10:00 p.m., Officer Martinez asked Officer Montijo, "He already signed it?" and Officer Montijo said, "Yeah." *Id.* at 15:42. At that point, Officer Martinez turned to Defendant and said, "I mentioned to you, you were acting kinda weird when I pulled you over. You already admitted to me you…came in here. You don't have any business being back here. You just didn't want to be stopped by me." *Id.* at 15:48. He went on: "So I have a couple questions for you now that you've signed these. Okay? Here is your copy and here is this."[12] *Id.* at 16:33. Officer Martinez said, "Just the way that you're acting, I need to ask you, do you have anything illegal in your car?" *Id.* at 16:37. Defendant denied having anything illegal or any drugs or guns specifically, in response to additional questions from Officer Martinez. *See id.* at 16:41-17:12. Defendant then said, "No, but you can check," while patting his pants. *Id.* at 17:14. Officer Martinez then asked: "Do you mind if I check your car?" and Defendant said, "Yes, of course you can..." *Id.* at 17:17. Defendant said he had his son's pistol in the car. *Id.* at 17:26. Defendant went on, "You can check it if you want." *Id.* at 17:29. Officer Martinez asked, "Do you have any problem with me checking your car?" and Defendant said, "No, no." *Id.* at 17:34-17:35. Officer Montijo then led Defendant to stand near the patrol cars, while Officer Martinez began searching the Chrysler. *See id.* at 17:51.

### Field Sobriety Test and Vehicle Search

At 10:03 p.m., Officer Montijo asked Defendant if he had consumed alcohol, and Defendant said, "I drank a twelve, but it's already been a long time since…" *Id.* at 17:59. Officer Montijo asked, "Only one?" and Defendant said, "Yes." *Id.* at 18:01-18:02. Officer Montijo then

---

[12] Though Officer Martinez issued the citations at this point, he retained Defendant's insurance card and license. *See* Mot. Hr'g Tr. at 107:15-25-108:1-6.

administered field sobriety tests.  *Id.* at 19:20.  Officer Montijo told Defendant that he smelled beer on his breath.  *Id.* at 18:49.  Defendant passed the field tests.  *Id.*

During the vehicle search, Officer Martinez found a handgun, a substance the officers believed to be heroin, and one hundred $20 bills.  *See* Govt.'s Ex. 1.  While Officer Martinez was searching the vehicle, Defendant made statements regarding the gun and suspected drugs, and he was placed under arrest.  *See* Govt.'s Ex. 2.  Defendant's son arrived on scene but was not permitted to speak with Defendant or remain on scene.  *See id.*  Defendant was transported to the Santa Fe Police Department, where he was interviewed.  *See* Transcript of Debaca Interview, Govt.'s Ex. 3.  Defendant signed a written consent to search and during a search of the vehicle, two more bags of suspected heroin were found.  *See* Govt.'s Ex. 1.  He was booked into the Santa Fe County Adult Detention Center.  *See id.*  His fingerprints were taken as part of the standard booking procedure, and law enforcement ultimately obtained his alien file ("A-file") as a result. *See* Doc. 101 at 8.

## II.
## LEGAL STANDARDS

The Fourth Amendment guarantees a person's right to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV.  The exclusionary rule prohibits introduction of evidence directly obtained by a violation of the Fourth Amendment and evidence that is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.").

A defendant may move to suppress evidence that is "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 485. To prevail, a defendant must first "demonstrate that his Fourth Amendment Rights were violated." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006), *cert. denied*, 550 U.S. 949 (2007). Then, he must show "a factual nexus between the illegality and the challenged evidence." *Id.* (citation omitted). "In order for a defendant to meet his burden of showing a factual nexus, he must, [a]t a minimum ... adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light *but for* the government's unconstitutional conduct [directed toward that complaining defendant]." *United States v. Ladeaux*, 454 F.3d 1107, 1111 (10th Cir. 2006) (alterations in original; citation omitted).

Once a defendant makes these showings, the government must "prove that the evidence sought to be suppressed is not fruit of the poisonous tree." *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014) (internal quotation marks and citation omitted). When a motion to suppress involves a warrantless search, "the government has the burden of proving its warrantless actions were justified." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (citation omitted). In presiding over a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Id.*

### III.
### LEGAL ANALYSIS

#### A. The Traffic Stop was Justified at its Inception.

The first question before the Court is whether the traffic stop of Defendant was justified at its inception. "A traffic stop is a seizure within the meaning of the Fourth Amendment," and courts "analyze such stops under the principles pertaining to investigative detentions set forth in *Terry v.*

*Ohio*, 392 U.S. 1 (1968)." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc); *accord United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011).

To be reasonable, a traffic stop must be (1) justified at its inception and (2) officers' "actions during the stop must reasonably related in scope to the mission of the stop." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (internal quotation marks and citations omitted); *see also United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013) ("When evaluating the reasonableness of a traffic stop, we ask first whether the officer's action was justified at its inception, then second whether it was reasonably related in scope to the circumstances which justified the interference in the first place.") (internal quotation marks and citations omitted).

A traffic stop is justified when the officer has "reasonable suspicion – that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *United States v. Gomez-Arzate*, 981 F.3d 832, 838 (10th Cir. 2020) (citation omitted). Typically, a traffic stop is justified if the officer observes or reasonably suspects a traffic or equipment violation. *See Botero-Ospina*, 71 F.3d at 787. An observed traffic violation "afford[s] the quantum of individualized suspicion necessary to ensure that police discretion is sufficiently constrained." *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009).

A police officer may also stop a vehicle if the officer has "a reasonable suspicion that [other] criminal activity may be afoot." *United States v. Whitley*, 680 F.3d 1227, 1233 (10th Cir. 2012). "For reasonable suspicion to exist, an officer must 'articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Whether an investigative detention is supported by reasonable suspicion 'does not depend upon any one factor, but on the totality of the circumstances.'" *Id.* (quoting *United States v. Simpson*, 609 F.3d 1140,

1146 (10th Cir. 2010)).  The government bears "the burden before the district court of establishing by a preponderance of the evidence that reasonable suspicion supported the officer's stop of [a] vehicle." *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012).

In this case, Defendant concedes that if Officer Martinez had confirmed that the Chrysler's registration was suspended before he stopped Defendant, then the stop was justified at its inception.  *See* Doc. 106 at 4.[13]  But, Defendant argues there is no written record to confirm that Officer Martinez confirmed the registration was suspended before he stopped Defendant.  The United States argues the stop was justified at its inception because Officer Martinez had reasonable suspicion that Defendant was driving the Chrysler without valid registration and because he also observed "suspicious" driving by Defendant "in an apparent attempt to avoid being pulled over," or alternatively, because an objectively reasonable mistake of fact about a traffic violation provides reasonable suspicion.  *See* Doc. 101 at 9-10.

Here, the Court concludes the traffic stop in this matter was justified at its inception because there is sufficient evidence showing the Chrysler's registration was suspended on the night Defendant was stopped by Officer Martinez, *see* Mot. Hr'g Tr. at 13:11-13, and Officer Martinez had an objective basis for believing the registration was suspended because he received an NCIC report indicating the registration status before he decided to pull Defendant over.  *See id.* at 23:19-25-24:1-9.  As noted by Defendant, there is some discrepancy in the record regarding when Officer Martinez ran the registration.  At the suppression hearing, testimony confirmed that call records show Officer Martinez advised dispatch he was making a traffic stop at 9:28 p.m. *See id*. at 76:6-25-77:1-3.  However, the timestamp on the NCIC report shows he ran the registration report at 9:30 p.m., which Officer Martinez disputed as being accurate, even though he had earlier vouched

---

[13] Operating a motor vehicle without valid registration is a violation of New Mexico law.  *See* Doc. 101 at 9.

for the accuracy of the same report. *See id*. at 77:4-25-78:1-16; 24:21-25-24:1-7.  The Court concludes that without more information about the accuracy, or lack thereof, of the timestamps on the NCIC report, the Court cannot conclude that the timestamps trump Officer Martinez's testimony regarding this sequence of events.  The Court finds that Officer Martinez believed the Chrysler's registration was suspended at the time he decided to pull him over and driving a vehicle with suspended registration is a traffic violation that supports initiation of a traffic stop.[14] Therefore, the traffic stop was justified at its inception.

**B.  The Officers' Actions During the Stop Were Unreasonable.**

    **1)  The Traffic Stop Was Unreasonably Prolonged.**

The next question for the Court is whether the traffic stop of Defendant was unreasonably prolonged in violation of the Fourth Amendment.  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."  *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)).  "It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings."  *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015).  An officer may also ask about the driver's travel plans, *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001), and ask about matters unrelated to the stop if those questions do not prolong the length of the detention.  *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007); *see also United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) ("An officer may conduct certain unrelated inquiries during the stop, but he

---

[14] The Court does not find Officer Martinez had reasonable suspicion of criminal activity based on Defendant's driving behavior, as explained below.

may not do so in a way that prolongs it absent the reasonable suspicion ordinarily required to detain an individual") (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)).

Under the Fourth Amendment, an officer's authority to seize the occupants of a vehicle ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. An individual "may not be detained even momentarily without reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 498. Reasonableness during a traffic stop is defined by what the officer actually does. *Frazier*, 30 F.4th at 1173 (citing *Rodriguez*, 575 U.S. at 357). "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Rodriguez*, 575 U.S. at 357 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Id.* at 350-351 (alteration in original; internal quotation marks and citations omitted). An officer may not constitutionally prolong a stop beyond that point except where (1) the encounter becomes consensual or (2) during the stop, the officer develops reasonable suspicion that the detained person is engaged in [other] criminal activity. *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020) (citation omitted); *see also United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015).

In other words, an unlawful seizure occurs during a traffic stop *"*when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that prolongs (*i.e.*, adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *Frazier*, 30 F.4th at 1173 (internal quotation marks and citations omitted).

14

**a.** **The Traffic Stop was Prolonged by Officers' On-Scene Discussion of Strategy for Investigating Other Possible Crimes.**

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. In addition to determining whether to issue a ticket for the traffic violation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes*, 543 U.S. at 408. "[A] traffic stop 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez*, 575 U.S. at 349 (quoting *Caballes*, 543 U.S. at 407); *see also United States v. Sharpe*, 470 U.S. 675, 686 (1985) (in determining the reasonableness of a traffic stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation"). Officers may take "negligibly burdensome precautions in order to complete [their] mission safely," but "[o]n-scene investigation into other crimes ... detours from that mission." *Rodriguez*, 575 U.S. at 356, 135 S. Ct. at 1616. "Under *Rodriguez*, it makes no difference whether an investigative detour occurs before or after completion of the stop's traffic-based mission. The question is whether the stop would have ended sooner had the officer continued to work diligently on the traffic-related tasks rather than pursue an unrelated investigation." *Frazier*, 30 F.4th at 1180.

Here, the officers diverted from the traffic-based mission of the stop when they strategized on-scene about investigating other unrelated criminal activity during their eleven-minute roadside discussion. The traffic-based mission of the stop was to assess the status of Defendant's registration and issue related citations. To the extent the Government implicitly argues that the mission of the stop was also to investigate whether Defendant was driving while intoxicated, transporting contraband or committing some other crime, the Court disagrees because the officers did not have reasonable suspicion to believe Defendant was engaged in other crimes, as explained below.

The officers diverted from the traffic-based mission stop to investigate ordinary criminal conduct during their eleven-minute discussion while Defendant waited in the Chrysler.  During the officers' roadside discussion, they not only spoke about what had happened during the stop up until that point, which is permissible, but they also strategized about options for searching the Chrysler to determine if it was being used for trafficking of some kind.  Forty-two seconds after the officers' debrief began, Officer Martinez said, "I'm gonna write up some citations, while I do that, I'm gonna have him step out, and I'm gonna see if I can get into his car, see if he's hiding anything."  Mot. Hr'g Tr. 00:42-48.  At one minute and twenty-four seconds into the debrief, as Officer Montijo described his previous encounter with Defendant and Officer Martinez described Defendant's red eyes and the single unopened beer, Officer Martinez said, "I can't, yeah, I'm not smelling anything, but I just want to get in there." *Id.* 1:27-1:31.

The discussion continued. When Officer Montijo described the type of vehicle Defendant drove during the prior stop, Officer Martinez responded, "That makes me want to get into this car even more." *Id.* 1:42-1:44.  About two minutes in, Officer Martinez said, "I'm gonna pull him out and have you chill out with him back here." *Id.* 2:08.  Later, when Officer Montijo described the prior stop of Defendant, he said, "he wasn't drunk that time.  He smelled, and he had blood shot eyes." *Id.* 6:52-6:59.  Officer Martinez responded, "Wanna go talk to him?...actually you know what?  You can talk with him while I'm in the car.  See if you get anything." *Id.* 6:59-7:04.  Shortly before Officer Martinez exited his patrol car with the finished citations, he told Officer Montijo, "Alright, so I'm gonna have him step out and I'm gonna have him get his dog." *Id.* 10:00-10:08.  He went on, "I could tow this car but it could backfire if he doesn't let me in though.  When I could've just towed the car." *Id.* 10:45-10:52.

Considering all of these comments together, the Court finds the officers' conversation was not only a debrief of the stop, it was also a discussion about how they could justify a search of the Chrysler to find evidence of a different crime from that which gave rise to the stop. The Government appears to concede this point, but attempts to justify the propriety of this discussion by asserting that it shows the officers had reasonable suspicion that Defendant was transporting contraband. *See* Doc. 101 at 17.  The Court rejects this circular argument.  The record is clear that, during their roadside discussion, the officers began investigating a crime different than the suspended registration violation that gave rise to the stop for which, as explained more fully below, there was no articulable reasonable suspicion.

The officers' discussion necessarily added time to the stop because each moment the officers spent strategizing how to get inside Defendant's vehicle diverted from the traffic-based mission of the stop.  *See Frazier*, 30 F.4th at 1173 ("each minute that the trooper spent arranging the dog sniff was time the citation-related tasks went unaddressed. Consequently, his actions necessarily prolonged the stop."); *see also Royer*, 460 U.S. at 504 (observing that legitimate law enforcement purposes did not justify officers waiting to ask for consent to search defendant's luggage until after relocating him from airport concourse to separate police room, and if officers had simply asked for consent initially, a "negative [search] result would have freed [defendant] in short order; a positive result would have resulted in his justifiable arrest").  In sum, the Court finds the stop was prolonged during the officers' on-scene strategy discussion at Officer Martinez's patrol car.

**b.  Even if Stop was not Already Prolonged by the Officers' Strategy Discussion, it was Prolonged when Officer Martinez Diverted from the Stop's Traffic-Based Mission to Instruct Defendant to Exit his Vehicle with his Dog.**

The "*Rodriguez* moment" occurs at "the moment when [an] officer extend[s] the stop by engaging in non-traffic inquiries."  *Frazier*, 30 F.4th at 1179 (referring to the Third Circuit's reference to "*Rodriguez* moment" in *United States v. Green*, 897 F.3d 173, 176-77 (3d Cir. 2018)). This Court has already found the *Rodriguez* moment in this case occurred when the officers conducted an on-scene investigation into other crimes during their strategy discussion.  But even if the Court had not found the stop was prolonged during the on-scene strategy discussion, the stop was prolonged when Officer Martinez ordered Defendant to exit the Chrysler with his dog because this request added time to the stop.  *See Mayville*, 955 F.3d at 830 ("Even *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment in the absence of reasonable suspicion.") (citation omitted).

When Officer Martinez had completed the citations, both officers approached the Chrysler and Officer Martinez said to Defendant, "Do you mind grabbing your dog and stepping back here to my car real quick?"  Mot. Hr'g Tr. at 11:14-11:24. At that time, the officers knew Defendant did not have a leash for the dog.  *See* Govt.'s Ex. 2 at 10:19-10:23 (Officer Martinez explaining to Officer Montijo that Defendant did not have leash for dog).   About one minute and fifty seconds after Defendant got his dog out of the Chrysler, Officer Martinez began issuing the citations to Defendant.  *See id.* at 12:00-13:51. This lapse of time was due to the officers' and Defendant discussing how the dog's collar came off earlier, Defendant confirming he did not have a leash, and the group watching the dog roam the street in the vicinity of the police cars and Chrysler, calling to the dog, and trying to bring the dog back to the group.[15]  *See id.* at 12:00-13:51.

---

[15] The Court is cognizant that the Fourth Amendment does not require police officers to use the least intrusive or most efficient means conceivable to effectuate a traffic stop.  *See Sharpe*, 470 U.S. at 687 ("The question is not simply

The Court finds that when Officer Martinez requested that Defendant exit the vehicle with his dog, he detoured from the traffic-based mission of the stop and prolonged the stop beyond the time reasonably required to issue the citations.   When Officer Martinez made the request, his "tasks tied to the traffic infraction [were] —or reasonably should have been—completed." *Rodriguez,* 575 U.S. at 354.  Instead of issuing the completed citations to Defendant, Officer Martinez asked Defendant to exit his car with his dog and relocated him to the area of his patrol car so he could continue his investigation after issuing the citations, thereby adding time to the stop. *See United States v. Hernandez,* 470 F. Supp. 3d 114, 125 (D.N.H. 2019) ("Instead of issuing a warning or a citation and sending Hernandez on his way, the Trooper asked Hernandez out of his car and moved him to the rear of the car to continue his investigation. There can be no dispute, then, that the Trooper's request that Hernandez exit his car added time, however brief, to the stop.").  Thus, while the traffic stop of Defendant was initially prolonged during the on-scene strategy discussion by Officer Martinez and Officer Montijo, it was further prolonged by Officer Martinez's request for Defendant to exit his vehicle with his dog after Officer Martinez had completed the traffic citations.

### 2) The Continued Detention of Defendant Lacked Lawful Justification.

An officer may not constitutionally prolong a stop beyond its mission except where (1) the encounter becomes consensual or (2) during the stop, the officer develops reasonable suspicion that the detained person is engaged in criminal activity.  *United States v. Cortez,* 965 F.3d 827, 833 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1250 (2021) (citations omitted).  Here, the stop did not become consensual nor did the officers develop reasonable suspicion.

---

whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.").  Nor may the Court "second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a lawful traffic stop.  This is because reasonableness – rather than efficiency – is the touchstone of the Fourth Amendment."  *Mayville*, 955 F.3d at 827.

### a.   **The Encounter did not Become Consensual.**

The stop did not become consensual at either point of prolongation because Defendant's license and insurance card were retained by the officers.  *See* Govt.'s Ex. 2 at 32:44; Mot. Hr'g Tr. at 107:15-25-108:1-6.  "[U]nless the officer has returned the driver's documentation, the driver is not free to go and the encounter is not consensual." *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993); *see United States v. Gomez-Arzate*, 981 F.3d 832 (10th Cir. 2020) ("a prerequisite for a consensual encounter is that the driver's documents are returned.").  The Court need not reach the other factors used by the Tenth Circuit to assess whether police conduct renders an encounter coerced rather than consensual because it is undisputed in this case that Defendant's documents were not returned.  *See, e.g. United States v. Spence,* 397 F.3d 1280, 1283 (10th Cir. 2005) (listing factors used to determine whether encounter is consensual).

### b.   **Officers did not have Reasonable Suspicion to Justify Prolonging the Stop.**

The Government concedes that the stop may have been prolonged if there had not been "two additional parallel investigations" into "contraband" and "DWI" during the stop.  Mot. Hr'g Tr. at 167:23-25-168:1-5.  Defendant maintains the stop was "measurably extended for reasons unrelated to the traffic stop," *id.* at 159:1-5, and the officers lacked reasonable suspicion.  *See* Doc. 106 at 11-13.  The Court finds Officers Martinez and Montijo did not have reasonable suspicion during the stop to prolong the detention to strategize about investigating whether Defendant was transporting contraband, investigate whether Defendant was driving while intoxicated, or investigate other criminal activity.

Reasonable suspicion requires a "particularized and objective basis for suspecting criminal conduct under a totality of the circumstances."  *Frazier*, 30 F.4th at 1174 (citations omitted); *see also United States v. Arvizu,* 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts

should make reasonable-suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.") (internal quotations and citations omitted). The "existence of objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." *Simpson*, 609 F.3d at 1147 (internal quotation marks and citations omitted). A "divide-and-conquer analysis" that assesses each factor supporting reasonable suspicion in isolation is not permitted. *Arvizu*, 534 U.S. at 274. Indeed, acts that appear innocent in isolation can give rise to reasonable suspicion when viewed in combination. *See id.* However, "the totality-of-the-circumstances test does not bar courts from discussing factors separately." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (citing *District of Columbia v. Wesby*, ─── U.S. ───, 138 S.Ct. 577, 588 (2018)). "It simply requires that courts consider the reasonable inferences that a law enforcement officer could draw from the objective facts in combination." *Id.*

The government bears the burden of proving the reasonableness of the officers' suspicion. *Pettit*, 785 F.3d at 1379; *Simpson*, 609 F.3d at 1146-1147. "While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011). "The government bears the burden of satisfying this standard, but it is not an onerous one." *Frazier*, 30 F.4th at 1174 (citation omitted).

Nonetheless, "the officer must point to specific, articulable facts" supporting his suspicion. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994). The Court must "judge the officer's conduct in light of common sense and ordinary human experience" and give "deference to an officer's ability to distinguish between innocent and suspicious actions." *Simpson*, 609 F.3d. at

1146 (citations omitted); *see also United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (evaluation of reasonable suspicion is "made from the perspective of the reasonable *officer*, not the reasonable *person*") (emphases in original; internal quotation marks omitted).

"The deference owed to the officer's judgment, however, is not unlimited." *Simpson*, 609 F.3d. at 1146. Indeed, "there is little to defer to where the investigating officer demonstrates no connection between his training and experience and the suspicion of illegality." *United States v. Dell*, 487 Fed. App'x 440, 446–47 (10th Cir. 2012) (finding officer "never articulated why his observations led him to suspect criminal activity—he did not discuss any prior experiences or training which supported his stated belief that a suspect peering into a car is likely involved in a car break-in"). "Even though reasonable suspicion may be founded upon factors consistent with innocent travel, some facts must be outrightly dismissed as so innocent or susceptible to varying interpretation as to be innocuous." *Simpson*, 609 F.3d at 1147 (citations omitted). "Inchoate suspicions and unparticularized hunches do not provide reasonable suspicion." *Id.* at 1147 (citation omitted).

Importantly, this Court must consider "only those facts known to the [officer] at the point he diverted from his traffic-based mission[.]" *Frazier*, 30 F.4th at 1174; s*ee also Green*, 897 F.3d at 179 ("After determining when the stop was extended…we can assess whether the facts available to [the officer] at that time were sufficient to establish reasonable suspicion that Green was involved in drug trafficking."). "[W]hen reasonable suspicion is lacking at the '*Rodriguez* moment,' seizure of the individual remains illegal from that point forward." *Frazier*, 30 F.4th at 1179. The Tenth Circuit has "long since rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the *Terry* analysis." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (citations omitted). Instead, the "objective standard" asks "whether the facts

available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Id.* (citing *Terry,* 392 U.S. at 21–22).

Here, at the time the officers diverted from the mission to strategize about investigating other crimes, there was not reasonable suspicion that Defendant was driving under the influence. The evidence indicates Officer Martinez's only observations about possible intoxication could have come during the period he initiated the traffic stop and during the approximately four minutes he stood next to Defendant's car at the beginning of the stop.

The Court has carefully reviewed all of the dash camera and body worn camera footage provided by the parties and observed the testimony of the officers during the suppression hearing. During his initial four-minute interaction with Defendant, Officer Martinez noticed Defendant had red eyes and an unopened beer in his passenger seat. *See* Govt.'s Ex. 2 at 01:21. Of note, Officer Martinez was in close proximity to Defendant during their entire four-minute encounter and when he described his observations to Officer Montijo shortly thereafter, he noted the red eyes and one unopened beer but that he "wasn't smelling anything." *Id.* at 01:21-1:27. At the hearing, Officer Martinez conceded he did not smell alcohol, but suggested this was because it was "cold," and he was wearing a mask. *Id.* at 95:8-10. The Court does not find this testimony credible because the Court's independent review of the dash camera footage clearly shows Officer Martinez was not wearing a mask over his nose or mouth while speaking with Defendant, but instead was wearing a hat and neck warmer -which likely would not have interfered with his ability to smell. *See* Govt.'s Ex. 10 at 06:38. Moreover, Officer Martinez's own comment to Officer Montijo clearly indicated he did not believe Defendant was intoxicated: "He has a beer in the passenger seat, but it's unopened…yeah, I'm not smelling anything, but I just want to get in there." Govt.'s Ex. 2 at 1:21-1:36.

The Court is cognizant it must not engage in a "divide and conquer analysis" when assessing reasonable suspicion. The Court must recognize the totality of the circumstances. Here, Officer Martinez testified he did not observe *any* other factors related to possible intoxication. *See* Mot. Hr'g Tr. at 97:13-25-98:1-12. He did not see signs of impaired driving by Defendant. *See id.* He did not see Defendant drive erratically. *See id.* He did not see Defendant unable to maintain his lane. *See id.* He did not see weaving within the lane. *See id.* He did not see any other "telltale characteristics of a drunk driver." *Id.* He did not observe any slurred speech, *see id.*, despite speaking with Defendant in close proximity over a four-minute period. Officer Martinez's police report contains no reference to suspicion of intoxication. *See* Govt's Ex. 1. In the Court's review of the body worn camera footage, when Officer Montijo arrived on scene, as the two officers discussed Defendant, Officer Martinez did not mention *any* concerns about Defendant's speech or behavior that indicated suspicion of intoxication.[16]  *See* Govt.'s Ex. 2. Considering the totality of the circumstances, the officers did not have reasonable suspicion of intoxication. *Cf. United States v. Hunnicutt*, 135 F.3d 1345, 1347–48 (10th Cir.1998) (holding that officer's observations of vehicle weaving between the center line and the shoulder line four to five times over a distance of approximately five miles created reasonable suspicion that the driver was under the influence); *see also Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) (finding reasonable suspicion where officer observed indicia of alcohol consumption including "moderate odor of alcohol, pinkish and watery eyes, a flushed face, unusually slow and deliberate speech, and slow hand movements"); *Botero–Ospina*, 71 F.3d at 785 (holding that observations of

---

[16] Officer Martinez testified that he and Montijo had an "agreement" that Montijo would conduct field sobriety tests after Martinez issued the citations. Mot. Hr'g Tr. at 43:18-22. The Court does not find this credible for several reasons. Most significantly, the Court heard no mention of such an agreement during the officers' roadside discussion, as captured on the body worn camera video. *See* Govt.'s Ex. 2. Additionally, Officer Montijo, who the Court generally found more credible, offered no such testimony.

driver swerving from outside lane, straddling center line, and then swerving back to outside lane gave rise to a reasonable suspicion that the driver was driving under the influence); *United States v. Rodriguez–Pando*, 841 F.2d 1014, 1017 (10th Cir. 1988) (holding that a car that "mov[ed] from side to side," "left the paved portion of the road," and "weaved over the center of the road" created reasonable suspicion of driving while intoxicated). The officers' investigative detour during their strategy discussion was not supported by reasonable suspicion that Defendant was driving under the influence.

Similarly, even if the detour did not occur until the time Officer Martinez asked Defendant to step out of his vehicle with his dog, the officers did not have reasonable suspicion of intoxication at that point. After Officer Martinez's first four-minute interaction with Defendant, Defendant was alone in his vehicle and the officers did not interact with him until approximately 16 minutes later, when they asked Defendant to step out of his vehicle with his dog. *See* Govt.'s Ex. 2. There is no evidence the officers observed anything during that entire 16-minute period that was a new factor suggestive of intoxication.[17] Considering the totality of the circumstances, the Court cannot find that the officers had reasonable suspicion of intoxication at the time Officer Martinez prolonged the stop.[18]

---

[17] The Court cannot consider Officer Montijo's claim that he smelled the "odor of intoxicating beverages coming from Defendant's breath" when Officer Martinez was handing Defendant the citations, Mot. Hr'g Tr. at 133:3-8, because this occurred after the unlawful detour of asking Defendant to exit his vehicle with his dog. In evaluating whether officers had reasonable suspicion, the Court assesses only those facts available to the officers at the time when the stop was extended. *See Frazier*, 30 F.4th at 1179 (question is "whether the facts known to [the officer] at [the moment he extended the stop] established reasonable suspicion. Facts learned later in the investigation are irrelevant.").

[18] Moreover, even if the first two investigative detours discussed above did not prolong the stop, the officers still lacked reasonable suspicion of intoxication at the time Martinez handed the citations to Defendant because the Court discounts Officer Montijo's testimony regarding the odor of alcohol. "[T]he credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994). Here, the Court finds it is significant that Officer Martinez did not smell any alcohol while standing next to Defendant's car and speaking to Defendant through the car window for about four minutes during the initial encounter while Defendant sat in his car. Officer Martinez stood right next to Defendant's open driver's side window during that entire interaction and spent the majority of that period with his head bent toward Defendant, frequently within one or two feet of the car window. *See* Govt.'s Ex. 10.

Likewise, the Court does not find the officers had reasonable suspicion that Defendant was transporting illegal contraband, as the Government contends, or that any other criminal activity was afoot. *See United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009) ("the probable cause inquiry is not restricted to a particular offense, but rather requires merely that the officer had reason to believe that a crime—any crime—occurred"). As a preliminary matter, the Court notes that although it is the Government's burden to prove the reasonableness of the officers' suspicions and recognizing this requires less than a showing of probable cause, the Government did not provide any authority for its assertions that each factor it identified led the officers to have reasonable suspicion. Though the Government provided authorities regarding the general legal principles of reasonable suspicion, *see* Doc. 101 at 15-16, the Court is left to consider the specific factual circumstances in this case with only the Government's conclusory statements that each fact contributed to reasonable suspicion and the Court's own research.[19] *Compare* Doc. 101 at 17 (officer "believed that Defendant was trying to 'distance himself' from the vehicle…This gave rise to reasonable suspicion…") *with Frazier*, 30 F.4th at 1178 (noting government "lean[ed] heavily on [Tenth Circuit case] to support its assertion that a vehicle's rental status may itself be suspicious").

Additionally, the Court finds that Officer Martinez was largely not credible, particularly during his testimony regarding his suspicions. This finding is made based on the Court's assessment of Officer Martinez' demeanor while in the courtroom and numerous contradictions in his testimony as compared to prior statements. "Judging the credibility of the witnesses,

---

Because Officer Martinez did not smell alcohol then, when Defendant was sitting in the confined space of his vehicle, the Court does not find Officer Montijo's testimony to the contrary to be credible.

[19] *See United States v. Williams,* 843 F. App'x 111, 116 (10th Cir. 2021) ("The government has not pointed to any case law supporting its view that the facts known to the officers provided reasonable suspicion ... What we have found in our review, however, supports our conclusion...").

determining the weight to be afforded the testimony, and drawing reasonable inferences and conclusions from the testimony, are within the province of the district court." *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997).

The Government presented various factors that it argues gave rise to reasonable suspicion. *See* Doc. 101 at 16-17; *see also* Mot. Hr'g Tr. at 121:2-25-122:1-15.  The Court reviews these factors.[20]

### i.   *Defendant's Slow Driving*

Officer Martinez testified that Defendant's "slowing down and refusing to let me get behind him" was a factor supporting his suspicion.  *Id*.  In support of this assertion by Officer Martinez, the Government relies heavily on the Supreme Court's decision in *Arvizu* for the admonition against a "divide-and-conquer" analysis.  The Court, however, notes a significant difference between the testimony of the agent in *Arvizu* and the conclusory statement made by Officer Martinez in this case.  In *Arvizu*, the Supreme Court found that a border patrol agent testified and sufficiently explained how each fact he relied on in stopping the defendant's vehicle – including the defendant slowing down when he spotted the agent - contributed to his reasonable suspicion based on inferences he made and his concrete experience as a border patrol agent patrolling the area in question.  534 U.S. at 277.  The agent explained, for instance, that the road near the border where he stopped the defendant was one known to be used by drug smugglers, that the type of automobile driven by the defendant was the type he had observed used by smugglers

---

[20] The Court is keenly aware it may not engage in a "divide-and-conquer" analysis in its assessment of reasonable suspicion and that it must view all of the factors provided in the aggregate and "as a whole."  *See Arvizu*, 534 U.S. at 277–78; *see also United States v. Karam,* 496 F.3d 1157, 1165 (10th Cir. 2007).  The format of the Court's discussion of the factors is based on the format of Tenth Circuit analyses where each factor is presented and analyzed separately and in the aggregate.  *See, e.g. Frazier*, 30 F.4th at 1174-1178; *see Pettit,* 785 F.3d at 1380 ("We evaluate each of the factors supporting reasonable suspicion separately and in aggregate."); *see also Karam,* 496 F.3d at 1165 ("Even factors which are not alone probative of illegal conduct may combine to amount to reasonable suspicion.).

in the area, that the driver was stiff and trying to pretend that the agent was not there as he drove by in an area where most persons would look over and wave to border patrol agents, that the children in the vehicle appeared to have their knees up as if their feet were propped up on some cargo, and that the driver turned off the road abruptly before reaching a border patrol checkpoint. *See id*. at 269-271. As to each factor, the agent tied his experience and knowledge about drug smuggling to his observations. *See id*.

Here, unlike the case in *Arvizu*, Officer Martinez did not explain why Defendant's slowing down on Cerrillos Road in Santa Fe, New Mexico, led him to suspect Defendant was transporting illegal contraband or engaging in other criminal activity and he did not discuss any prior experiences or training that supported his belief. Nor has the Government explained the legal significance of Defendant's slowing down or made any rational connection between the speed of Defendant's vehicle and any criminal activity that could lead to reasonable suspicion. *See Dell,* 487 F. App'x at 446–47 ("The government's argument that [defendant's] behavior was 'inherently suspicious' is conclusory, and skips the crucial part of reasonable suspicion analysis by failing to ask—or answer—why the officer's observations indicated suspicious criminal behavior."). If Defendant's speed had been a traffic violation, that may have contributed to reasonable suspicion of an independent traffic violation that would justify a stop, *see United States v. Solorio-Mendoza*, 731 Fed. App'x 583, 585 (9th Cir. 2018) (Defendant "slowed down to such an extent that the car behind him was impeded" giving the deputy reasonable suspicion to conduct a traffic stop because impeding traffic was a violation of the California Vehicle Code), but here Officer Martinez goes beyond claiming reasonable suspicion to stop the vehicle for a traffic infraction and, without explanation, asserts he had reasonable suspicion to investigate the transporting or possession of

illegal contraband or other criminal activity.[21]  Without more the Court is not inclined to give this assertion much weight, although it does consider this factor as part of the totality of the circumstances.

### ii.   *Defendant's Turn onto Navajo Road*

Next, Officer Martinez testified that while Defendant was driving at a slow speed, he turned onto a side road.  *See* Mot. Hr'g Tr. at 121:10-13.  The Government did not explain why Defendant's turn reasonably led the officers to suspect Defendant was transporting illegal contraband and again Officer Martinez did not discuss any prior experiences or training that supported this belief.  The officer testified Defendant "made what appeared to me as a very evasive maneuver trying to -- he determined he was going to get pulled over. It appeared to me he made a very evasive maneuver by just taking a random side street down Navajo Drive." *Id.* at 44:12-16. The officer went on: "I had a feeling this individual was being evasive and not wanting me to pull him over."  *Id.* at 29:9-12.

The officer's conclusory description that the turn was "evasive" lends little weight to the reasonable suspicion analysis.  In *United States v. Peters*, the government characterized a lane change as "abrupt" and argued the "the act of changing lanes while being followed by a law enforcement officer is indicative of an immigration violation."  10 F.3d 1517, 1521 (10th Cir. 1993).  The Tenth Circuit held that "a single, legal lane change cannot provide grounds for reasonable suspicion of an immigration violation under any circumstances."[22] *Id.* at 1521.  Though

---

[21] Officer Martinez testified that no traffic violation occurred when Defendant slowed down and turned "other than maybe going significantly below the posted speed limited."  Mot. Hr'g Tr. at 88:3-6.  Officer Martinez did not testify this was an independent traffic violation, and he did not cite Defendant for any such violation.

[22] While an immigration violation is not the same as transporting illegal contraband, without an explanation from the officer as to why Defendant's turn was indicative of contraband transportation, the Court finds the reasoning in *Peters* useful.

the government argued defendant's truck "weaved" while the officer was following, the Court rejected that contention and noted the record was "clear that the Ryder truck made no illegal movements during this period." *Id.* The Court "decline[d] to interpret a legal and properly executed lane change, even if 'abrupt,' as 'weaving.'" *Id.*

This Court is confronted with a somewhat similar situation here. The record is clear Defendant did not swerve, weave, or make any other illegal movements while driving and turning off of Cerrillos Road. The Court agrees Defendant's speed could be characterized as "slow," but neither the record nor the law support a finding that Defendant's turn was "evasive." The Court further concludes that this case is distinguishable from those cases where the Tenth Circuit has considered "evasive" or "erratic" behavior to constitute a factor in finding reasonable suspicion under the totality of the circumstances. In *United States v. Briggs*, 720 F.3d 1281 (10th Cir. 2013), for example, the Tenth Circuit found that "a sudden change of direction upon seeing law enforcement, increased speed in an apparent attempt to create distance from the officers, and repeated glances over one's shoulder are circumstances that reasonably suggest evasion…Although this evidence may not alone establish reasonable suspicion, it moves the marker forward."[23] *Id.* at 1287.

There are some key differences between the defendants' actions in *Briggs* and the actions of the Defendant in this case. In *Briggs*, the focus was on the reaction that the defendant had once he saw police officers – actions that would have indicated to a reasonable officer that the defendant was being evasive or erratic and hence suspicious. *See Briggs*, 720 F.3d at 1286 (explaining that the defendant and his companion's "evasive and erratic movements" began when the officers'

---

[23] The Court affirmed that reasonable suspicion existed based on the combination of this behavior, in addition to the high-crime area where it occurred, defendant's grabbing at his waistline, the duo splitting paths, the defendant's backpedaling away from officers, and the flight of the defendant's companion. *Briggs,* 720 F.3d at 1285-1293

vehicle came into their view); *see also Wardlow*, 528 U.S. at 125 (officer had reasonable suspicion in part because the defendant looked in direction of officers and ran away, and "unprovoked flight" is the "opposite" of "going about one's business").  Here, the actions taken by the Defendant, even if it was true that he saw Officer Martinez, could hardly be described as erratic or even evasive. There is no testimony or other evidence, for example, that Defendant observed Officer Martinez and then sped up to try and create distance between him and the officer, or even that the turn that he made was taken in a reckless manner or was illegal in any other way.  Instead, Defendant's vehicle slowed down and he turned right into a neighborhood adjacent to the street he was traveling when spotted by Officer Martinez. Officer Martinez did not testify that Defendant's speed increased, that he made any erratic movements or that he led the officer on a chase.  *See* Mot. Hr'g Tr. at 87:25-88:1-6, 88:20-21, 121:7-13.   The officer instead testified that the turn was not an illegal turn and said "other than maybe going significantly below the posted speed limit" the turn did not comprise a traffic violation.  *Id.* at 121:7-13.  Nor is there any evidence that Defendant failed to stop in response to police lights.  *See United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997) (recognizing that "a driver's failure to promptly stop an automobile in response to flashing police lights [can be] a factor supporting reasonable suspicion."); *see also United States v. Ludwig,* 641 F.3d 1243, 1248 (10th Cir. 2011) (offering string cite that failure to stop can be factor supporting reasonable suspicion).[24]  The lack of lights and sirens is important because police sirens and lights are a clear sign of authority and presumably motorists must stop when an officer activates lights and sirens.  Yet, from the time Officer Martinez first saw Defendant's vehicle and

---

[24] Significantly, the cases cited in *Ludwig* involved officers who had activated either their police lights and/or sirens, not police cars that had activated neither.  *See Villa–Chaparro*, 115 F.3d at 799, 802 (10th Cir. 1997); *United States v. Elkins*, 70 F.3d 81, 83 (10th Cir. 1995); *United States v. Walraven*, 892 F.2d 972, 973, 975 (10th Cir. 1989).

throughout the time Defendant slowed down and turned, the officer did not activate his patrol vehicle's lights or sirens.[25]  *See id.* at 31:2-3-17.

In sum, "not all attempts to avoid police contact raise suspicions of criminal activity." *Briggs*, 720 F.3d at 1287.  Without a concrete, particularized basis for why the fact that Defendant turned off of Cerillos Road suggested Defendant was transporting illegal contraband, this factor lends little weight to the reasonable suspicion analysis.  The Court will, however, consider its significance as part of the totality of the circumstances regarding the legality of the traffic stop at issue.

### iii.  Officer Martinez's Turns to Locate Defendant

The next factor offered to support reasonable suspicion that Defendant may have been transporting contraband is that Officer Martinez had to make "three to four turns" in "no reasonable – normal pattern" to find Defendant's vehicle after turning onto Navajo Drive.  Mot. Hr'g Tr. at 121:13-17.  The dash camera shows Officer Martinez made three turns once he was in the neighborhood.  *See* Govt.'s Ex. 10. Officer Martinez did not testify specifically what this meant to him, but the Court infers the government is implicitly arguing this indicated Defendant was fleeing Officer Martinez.  The facts do not support such a finding.

First, Officer Martinez did not see Defendant speed up at any point in time.  Second, the Court was not provided any calculation of the distance between where Defendant turned and where he was located, or a map of the officer's driving path.  Third, the Court cannot infer that Defendant was trying to distance himself from Officer Martinez based on the record before it.  The Court notes that Officer Martinez could not know what Defendant did after he turned off of the road

---

[25] The Court is not suggesting the officer's vehicle was not identifiable as a police vehicle.  *See Briggs,* 720 F.3d at 1287 (defendant's movements "might not have been suspicious if officers were not readily identifiable as police").  The record is clear that the vehicle was a marked Santa Fe Police Department vehicle.

32

because Officer Martinez did not immediately turn onto Navajo Drive behind Defendant. Instead, Officer Martinez drove forward on Cerrillos Road until the next area where he could make a U-turn, turned around, and then turned onto Navajo Drive. *See id.* at 29:8-16. The dash camera footage begins several seconds before the officer made his U-turn. *See* Govt.'s Ex. 10 at 0:00-0:03; *see also* Mot. Hr'g Tr. at 67:2-5 (officer describing he turned the dash camera on when he decided to make the traffic stop). Officer Martinez turned onto Navajo Drive seventeen seconds after the footage begins. *See* Govt's Ex. 10. Officer Martinez testified the spot where he made the U-turn was "not far" and "maybe a couple seconds after [Defendant] had passed him." Mot. Hr'g Tr. at 29:14-16. The Court infers that Defendant was in the Navajo Drive neighborhood for approximately fifteen seconds. Without particularized information from the officer about what his three turns indicated and without authority showing the legal significance of these turns, the Court gives this factor little weight.

### iv.  *Location of Defendant's Car Blocking Resident's Driveway*

Next, the Government offered as another relevant factor that Defendant parked his vehicle in a way that blocked someone's driveway.[26] Mot. Hr'g Tr. at 121:18-19. The officer's reason for listing this fact was, "It's not normal for somebody to do that." *Id.* While neither the officer nor Government provide any further explanation as to the significance of this fact or how it may be tied to trafficking in contraband, the Court will consider it in its analysis of the totality of the circumstances but does not give it any substantial weight.[27]

---

[26] The officer also testified that Defendant "parked on top of the sidewalk." Mot. Hr'g Tr. at 31:6. The Court has reviewed the dash camera footage and disagrees that Defendant was parked on the sidewalk. The Court will not credit Officer Martinez's testimony on this point. Additionally, Officer Martinez did not list this factor when he was asked to list the specific facts that gave him reasonable suspicion, which is another reason the Court does not consider it.

[27] The Court also notes that the record does not suggest Defendant was located in a high-crime area during his encounter with the officers. Mot. Hr'g Tr. at 29 (Officer Martinez describes Navajo Drive as "one of the main arteries into a larger residential subdivision…just a residential road"). While a suspect's presence in a high-crime area is not enough on its own to justify reasonable suspicion, it is "still relevant" to an analysis of the totality of the circumstances.

### v. *Defendant's Exit from Car with Dog*

Officer Martinez testified that Defendant got out of the Chrysler in a "hurried manner, grabbing his dog, again without a leash, like he was trying to just get away from the car." *Id.* at 121:20-22; 122:2-4.  Officer Martinez testified this was important because

> in similar circumstances, the evasiveness, him separating from the vehicle, I think it made me feel as if the Defendant was trying to separate himself from the vehicle. In some circumstances, people tend to want to get out of their car and away from it, so that police can't either put them behind the wheel, so that no enforcement action could occur after that, just in case[,] You didn't see me driving…So I think in this situation, you know, there's things in my car that I don't want you to find. I'm separating myself from it. I think in these circumstances, all of those behaviors and the actions that he demonstrated at that time led me to believe all of those things could be true in this traffic stop.

*Id.* at 33:11-24.  When Officer Martinez was asked, "And you thought that [taking the dog out of the car] was because he wanted to separate himself from the car.  He wanted to put distance between him and the car?" he responded, "That's the way it made me feel, yes." *Id.*  at 89:3-6.

The Court does not have before it any legal authority indicating the significance of a defendant exiting his vehicle with his dog on a public street in an officer's presence.  The Court does note, however, that Officer Martinez's actions during this point in his interaction with Defendant is inconsistent with the idea that he reasonably suspected illegal contraband was in the Defendant's vehicle.  When Defendant exited the vehicle with his dog, Officer Martinez almost immediately ordered Defendant to get back into the vehicle, rather than order him onto the ground or any other location where Defendant would not have access to any alleged contraband in the Chrysler.  "Common sense" and "ordinary human experience" suggests that this cuts against the officer's professed belief that contraband was inside the vehicle.  *See Simpson*, 609 F.3d. at 1146.

---

*Briggs*, 720 F.3d at 1286 (citations omitted).  For the sake of clarity of the record, neither party offered any evidence that the Navajo Drive neighborhood was a "high-crime area" so the Court will make no such finding.

Indeed, Officer Martinez conceded on cross-examination that the safest place for police to interact with an individual is outside of the individual's vehicle.  *See* Mot. Hr'g Tr. at 72:4-7.

Finally, the Court does not credit Officer Martinez's testimony that Defendant's manner was "hurried" because the Court's own review of the video does not show Defendant moving in a hurried manner.   *See* Govt.'s Ex. 10.  Still, the Court will consider Defendant's exit from his vehicle with his dog as part of its totality of circumstances analysis.

### vi.  *Defendant's Statements about the Dog and Not Wanting to be Pulled Over*

Officer Martinez testified that Defendant told him he was dropping off the dog to a family member but the address he gave was in a different part of town, and that Defendant said he did not want to be pulled over so he "came back here and parked."  Mot. Hr'g Tr. at 121:23-25-122:1-3; *see also* Govt.'s Ex. 1.  The Government did not provide any explanation for why this contributed to suspicion that Defendant was transporting contraband or that other criminal activity was afoot, but the Court assumes the point is that it is reasonable for a police officer to become suspicious when a defendant offers an explanation for their travel that does not make sense and then admits he did not want to be pulled over by the police

In the context of reasonable suspicion analysis, the Tenth Circuit has credited "a defendant's alleged 'evasiveness' regarding his travel plans [when] the officer [is] able to provide some objective grounds for his belief that the defendant [is] trying to hide his criminal conduct." *Frazier*, 30 F.4th at 1176.  The *Frazier* Court pointed to two illustrative cases.  In one, the "officer asked about the defendant's travel plans only for the defendant to go off on a tangent studded with wholly irrelevant information that was inconsistent with the route he was traveling. And the officer's suspicions were further bolstered by the 'very heavy smell' of air freshener and coffee, which the officer described as masking agents commonly used by drug traffickers.*" Id*. (citing

35

*United States v. Sanchez-Valderuten,* 11 F.3d 985, 987 (10th Cir. 1993)).   In the second case, "the officer knew that the defendant had a criminal history involving drug transportation, his trembling exhibited extreme nervousness, and he gave inconsistent answers regarding the timeline of his trip." *Frazier*, 30 F.4th at 1176 (citing *Simpson*, 609 F.3d at 1147–48).   Considering those cases, the *Frazier* Court found it unreasonable for the district court to hold that the defendant's responses in that case were indicative of deception because the officer did not cite any "meandering, inconsistent, or illogical answers." *Id.*

Likewise, in this case Defendant's statements were not inconsistent, meandering, or illogical.   Indeed, his admission that he did not want to be pulled over is logical.   Just as it is "common knowledge that most citizens ... whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness," *United States v. Millan–Diaz,* 975 F.2d 720, 722 (10th Cir. 1992), it is not surprising that a driver would not want to face a police encounter.   *See Wardlow*, 528 U.S. at 132, 133 & nn.9-10, 134 & n.11. (Stevens, J., concurring in part and dissenting in part).   While a court should consider a defendant's lie in assessing reasonable suspicion, *see United States v. Byron*, 817 Fed.Appx. 753, 759 (11th Cir. 2020), in this circumstance, where Defendant promptly admitted he did not want to be pulled over, the Court does not give significant weight to Officer Martinez's reliance on Defendant's statements but does consider them as part of the aggregate.

### vii. Officer Montijo's Prior Traffic Stop When Defendant Drove a Different High-End Car

Next, Officer Martinez testified that Defendant was recently pulled over "for similar circumstances and that very similar things occurred during his traffic stop and [defendant was] driving a different car … a high-end car like a Maserati or a Jaguar."  Mot. Hr'g Tr. at 122:4-8. The Government does not explain why these facts contributed to suspicion that Defendant was

transporting contraband or engaged in other criminal activity.  To the extent Officer Martinez suggests that Officer Montijo's prior stop of Defendant was similar, the Court notes Officer Montijo described the facts of the prior stop to include that Defendant had an unopened beer, was driving a Jaguar or a Maserati, the registration was "weird" because the car was registered to Defendant's son, and a young woman came to pick Defendant up.  *See* Govt.'s Ex. 2 at 1:05-2:00. Criminal history can contribute to reasonable suspicion in conjunction with other factors.  *See United States v. Santos,* 403 F.3d 1120, 1132 (10th Cir. 2005).  But Officer Martinez could not have believed that Defendant previously fled or was caught with contraband in the car, because Officer Montijo did not tell him that.  The Government does not provide any explanation for why the previous stop of the Defendant contribute to the reasonable suspicion analysis.

Likewise, the Court dismisses the type of car as completely innocuous.  "[W]hile vehicle characteristics cannot, by themselves, support a finding of reasonable suspicion, they are factors that may be considered, as part of the totality of the circumstances, along with other contributing factors." *United States v. Lujan*, 188 F.3d 520 (10th Cir. 1999) (unpublished).  In *Lujan*, the Court affirmed the trial's courts conclusion that the fact defendant was driving a Lincoln could be considered in combination with the other factors in that case because the officer "testified that he had personally been involved in a drug seizure involving a Lincoln just a few days prior to his encounter with Lujan, and that drug traffickers tend to act in patterns with regard to the type of vehicles they use." *Id.*  Neither officer provided similar testimony here.  As a result, the Court gives no weight to the type of vehicle Defendant previously drove or the vehicle he was in on the night in question.

### viii. The Defendant's Nervousness, Stuttering and Reluctance to Answer Questions

Officer Martinez testified that Defendant was nervous, stuttered, and avoided questions. *See* Mot. Hr'g Tr. at 122:8-12.  The Court gives this factor little weight for several reasons.  First, Officer Martinez testified he apparently noticed this behavior "when I pulled him out of his car." *Id*.  Importantly, the officers did not have Defendant exit the vehicle until approximately 22 minutes into the traffic stop and Officer Martinez did not testify he noticed any nervousness during his first four-minute conversation with Defendant.  *See* Govt.'s Ex. 10.  And, at the point they "pulled him out" of the Chrysler, the Court has already found that the stop was unreasonably and unlawfully prolonged and so it is not inclined to consider facts that arose after that point in time.

Second, neither in his conversation with Officer Montijo nor his in his police report did Officer Martinez describe Defendant as nervous, stuttering, or avoiding questions.  Moreover, in the video evidence in the record, the Court does not observe that Defendant's actions were consistent with that characterization. *See Rodriguez-Escalera*, 884 F.3d at 669 (court was not required to credit [officer's] testimony that the couple appeared nervous when the court's own review of the traffic stop footage led it to the opposite conclusion).

Finally, even if there was evidence of some nervousness on the part of Defendant, the Tenth Circuit has warned that such evidence should be viewed with caution, given that "it is common knowledge that most citizens . . . whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness." *Millan–Diaz*, 975 F.2d at 722; *see also United States v. Hall*, 978 F.2d 616, 621 n. 4 (10th Cir. 1992) ("While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials....").

In sum, the Court does not find Officer Martinez's testimony on this point to be credible and there is no evidence to support the assertion Defendant was nervous, stuttered or avoided the officer's questions.  Even if there was, it would be of limited significance given the Tenth Circuit's position on this issue.

### ix.  Totality of the Circumstances

Viewing the facts in the aggregate, the Court finds there was not reasonable suspicion that Defendant was transporting illegal contraband or that other criminal activity was afoot.  First, the Court looks to one of the Tenth Circuit's most recent applications of *Rodriguez.*  In *Frazier*, like here, the defendant had moved to suppress evidence discovered during a traffic stop that he alleged had been impermissibly prolonged in violation of his Fourth Amendment right against unreasonable seizures. 30 F.4th at 1170.  As in this case, in *Frazier* the government in pointed to a number of factors that it contended established reasonable suspicion of drug trafficking to justify the prolonged detention of the defendant in that case.  But the government failed to show, even under a totality of the circumstances, how the facts relied on could have been based on anything other than unsubstantiated hunches.  For instance, rather than connect the defendant's possession of two identification cards to "some particularized indicia of wrongdoing," the government "merely cite[d] the IDs as an 'odd fact' that 'could' have caused the trooper to suspect that something was 'amiss' when considered together with his other observations," 30 F.4th at 1176-1177, including a duffle bag in the defendant's vehicle, an air freshener bottle, a partially unrolled window, the defendant's suspicious responses to questioning, a missing rental agreement, and the defendant's driving a rental car across the country. *Id*. at 1174-1177.  The Tenth Circuit rejected this "flimsy" reasoning, finding that "[a]lthough wholly innocent conduct may support a reasonable suspicion when viewed alongside other factors, *there must be a concrete reason to*

*support that interpretation*." *Id.* at 1177 (emphasis added).   After examining each factor individually and deciding the weight of each, the Court stated: "[s]tripped of those facts that must be disregarded as completely innocuous, we are left with the trooper's hunch that [the defendant] was trying to hide something and the fact that he was driving a rental car.  Reasonable suspicion is a low bar, but it is not that low." *Id.* at 1178.  As a result, the officer lacked reasonable suspicion to prolong the traffic stop for several minutes to arrange for a dog sniff.  *See id.*

The circumstances here are remarkably similar.   On re-direct examination, Officer Martinez was asked what all the factors he cited meant to him.  He responded,

> the Defendant knew something – or was trying to hide something.  There was something that the Defendant was trying to hide.  I think by him going down these random neighborhoods and trying to leave his car, basically, made me believe there may be something in the car he was trying to separate himself from that he didn't want me to find out about because maybe he knew that he doesn't have a valid driver's license and that he knew that there was a potential of his car getting towed with potential contraband within.

Mot. Hr'g Tr. at 122:18-25-123:1-4.  Like in *Frazier*, Officer Martinez had a hunch that Defendant was trying to hide something, but the totality of the circumstances does not show that reasonable suspicion existed.

When considering all of the factors, the facts are that Officer Martinez saw Defendant slow down, make a legal right-hand turn, park in front of someone's driveway, exit his vehicle with his dog, and admit to Officer Martinez that he did not want to be pulled over.  The record does not show that Defendant fled in the Chrysler when Defendant turned onto Navajo Drive.  Officer Martinez did not activate his lights and sirens until he saw Defendant exiting the Chrysler with his dog, meaning Defendant did not drive away from a police car with lights and sirens going.  Contrary to Officer Martinez's testimony, Defendant did not park the Chrysler on top of the sidewalk, though it was in front of a driveway. Officer Martinez testified he called for backup

because of the "evasive" circumstances, *id.* at 34:12-13, and because of "officer safety concerns," *id.* at 71:7-9, yet he told Officer Montijo on scene that he called for backup because Defendant had a dog without a leash, *see* Govt.'s Ex. 2 at 00:10:00-10:32, and during the stop, before Officer Martinez sought consent, neither officer's behavior indicated they had any unusual concern about their safety or preserving possible contraband on the scene. This is evidenced by the fact that Officer Martinez ordered Defendant to get back in the Chrysler, where he sat alone for about eleven minutes, instead of preventing Defendant from having access to the inside of the car. The officers did not pat search Defendant until *after* the firearm was found during the vehicle search, *see* Mot. Hr'g Tr. at 71:10-12, 151:18-20, and until that point, Officer Martinez did not appear to be overly concerned about his safety with respect to Defendant possibly being armed. *See id.* at 71:13-22.

The Court does not find Officer Martinez's testimony regarding Defendant's behavior to be credible. The officer described Defendant as "nervous" and "hurried." But in the Court's assessment of the video footage, Defendant did not exit his vehicle in a "hurried" manner nor did he appear nervous. Additionally, before testifying, Officer Martinez did not describe Defendant in this way in either his police report or to Officer Montijo. Throughout the hearing, the officer appeared overly invested in depicting the facts in the light most favorable to protecting the prosecution, likely because it was "one of [his] biggest drug busts as a patrol officer, so it's kind of stayed near and dear to [his] heart." Mot. Hr'g Tr. 95:19-21.

The facts in this case are unlike those where officers were found to have reasonable suspicion. In *United States v. Torres*, 987 F.3d 893 (10th Cir. 2021), an investigate detour was lawful in part because the officers suspected a violation of federal drug laws based on the smell of "burnt marijuana" coming from the defendant's vehicle. In *Gomez-Arzate*. 981 F.3d at 843-844. in addition to the "overwhelming" scent of air freshener, officers had reasonable suspicion because

the defendant was driving a car registered to an absent third party, the driver was listed on the insurance but not on the registration, the passenger could not recall the name of the person who loaned him and the driver the vehicle but the driver claimed the car belonged to passenger, and the passenger and driver told officers they were "going to Texas to see a ranch and clean up a house, but neither knew the name of the owner of the ranch, or the 'friends' they were going to stay with.'" *Id.* at 844.

In this case, the combination of factors before the Court do not rise to the level of reasonable suspicion.   The Government mentioned additional factors that gave the officers reasonable suspicion: Defendant's registration was suspended, he was driving a vehicle not registered to him, he did not have a valid U.S. driver's license, the registration did not match the insurance policy, and though Defendant had been in the United States for two years, he still had a Mexico driver's license.  *See* Doc. 101 at 17.  But the Government does not explain why these factors, in addition to the factors already discussed, created reasonable suspicion.  The Court does not have a basis for finding that Defendant's Mexican license, his invalid registration, or the mismatch between his registration and insurance policy, in combination with the other factors, created reasonable suspicion that Defendant was driving while intoxicated, transporting contraband, or that any other criminal activity was afoot.

In conclusion, the officers did not have reasonable suspicion to lawfully extend the stop at the time they strategized about investigating other crimes or at the point Defendant was asked to exit the Chrysler with his dog.  Because they lacked reasonable suspicion to extend the stop, Defendant's seizure violated the Fourth Amendment.

**C. The Evidence to be Suppressed as a Result of Fourth Amendment Violations.**

Having determined Defendant's seizure was unlawful, the next question is whether the physical evidence found in the car during Defendant's unlawful seizure and subsequent to Defendant's consent to search should be suppressed. The Court also considers whether suppression of Defendant's roadside statements, statements made following his arrest, fingerprints and contents of his immigration A-file is warranted.

Evidence obtained in violation of a defendant's Fourth Amendment rights will generally be excluded from the criminal prosecution. *United States v. Calandra*, 414 U.S. 338, 347 (1974) ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule applies if the defendant can show by a preponderance of the evidence a violation under the Fourth Amendment and a factual nexus between the violation and the evidence sought to be excluded. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). The burden then shifts to the government to prove that an exception to the exclusionary rule applies. *See Torres-Castro*, 470 F.3d at 999.

**1) The Physical Evidence Found in the Defendant's Vehicle.**

"When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was 'a break in the causal connection between the illegality and the evidence thereby obtained.'" *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010) (quoting *United States v. Melendez–Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994)). Courts "require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's

consent, but also to effectuate the purposes of the exclusionary rule." *Melendez–Garcia*, 28 F.3d at 1257.

For the government to show that the taint of an illegal seizure has dissipated such that subsequently discovered evidence is admissible, "it must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996) (quotation omitted). "This is a heavy burden." *Fox*, 600 F.3d at 1259. The Supreme Court has put forth three factors that guide this inquiry: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

As discussed above, the Court finds Defendant has satisfied his burden to establish a Fourth Amendment violation, and the Court has found the officers unreasonably prolonged the traffic stop without lawful justification. Of course, "[e]vidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is *at least* the but-for cause of its discovery." *Gomez-Arzate*, 981 F.3d 832, 840–41 (citation omitted; emphasis in original). A "but-for cause" is understood as the "factual nexus between the illegality and the challenged evidence." *Id.* (citation omitted)

Here, Defendant has shown a factual nexus between the Fourth Amendment violation and physical evidence found in the vehicle. But for the unconstitutionally prolonged stop, the officers would not have found the narcotics and firearms inside the vehicle because Defendant would have been sent on his way with only traffic citations. If Officer Martinez had not engaged Officer Montijo in a strategy discussion, the officers would instead have discussed the citations and debriefed the stop, and then they would have issued the citations and allowed Defendant to leave.

44

Without the on-scene investigation regarding other crimes, without reasonable suspicion, the evidence would not have been discovered.

With regard to the consent to search following the unlawful stop, the Court notes that the Government has not shown or even explicitly argued for attenuation. However, even assuming it had, the Government could not have met its burden. Regarding the first factor under *Brown*, there was extremely close temporal proximity between the time Defendant was illegal seized and his subsequent consent to search the vehicle. The illegal seizure began at approximately 9:45pm, or forty-five seconds into the officers eleven-minute discussion, when Officer Martinez began strategizing with Montijo about how to get into the Chrysler. The illegal seizure continued throughout the officers' discussion and was ongoing at the time Officer Martinez elicited Defendant's consent to a search of the vehicle at about 10:02 pm. Thus, this factor weighs against finding attenuation. *See United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994) (first factor "weigh[ed] heavily against finding the taint cleansed" where the defendant consented "only a few minutes after being illegally detained"); *United States v. Mendoza–Salgado*, 964 F.2d 993, 1012 (10th Cir.1992) (thirty to forty-five minute period by itself "reveal[ed] little about whether the [time] that elapsed had any effect on [the] decision to permit the search"); *United States v. Maez*, 872 F.2d 1444, 1455 (10th Cir.1989) (thirty minute time period between "the arrest and Mrs. Maez' consents clearly indicate that [the] taint [of the Fourth Amendment] violation was not purged").

Turning to the second *Brown* factor, the Court finds no intervening circumstances here. "The facts or events must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated." *Gregory*, 79 F.3d at 980. *See Fox*, 600 F.3d at 1261 (citing cases that show intervening circumstances can include officers explaining consent form to defendant, releasing a defendant from custody, appearance in front of a judge or

speaking with an attorney).  Officer Martinez elicited Defendant's consent while he was illegally seized and within moments of giving Defendant the traffic citations.  The Government has not shown any intervening circumstances and the Court finds none.  This factor weighs against finding attenuation.

Lastly, the Court examines the purpose and flagrancy of the official misconduct.  "[P]urposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up."  *Fox*, 600 F.3d at 1261 (internal quotation marks and citation omitted).  The record indicates Officer Martinez's conduct was purposeful and flagrant.  From the first moments of his discussion with Officer Montijo, his comments demonstrated that his goal was to examine the Chrysler's contents.  Neither officer told Defendant he was free to leave or that he could refuse to consent.  *See United States v. Fernandez*, 18 F.3d 874, 882 (10th Cir. 1994) (although "not a prerequisite to establishing voluntary consent," informing an individual of the right to refuse consent is "a factor particularly worth noting") (citations omitted).  The combination of Officer Martinez's comments to Officer Montijo in addition to not advising Defendant of his right to leave indicate Martinez detained Defendant "with a quality of purposefulness, embarking upon a fishing expedition in the hope that something might turn up." *McSwain*, 29 F.3d at 563; *see also United States v. Caro*, 248 F.3d 1240, 1247-1248 (10th Cir. 2001).  This factor weighs against finding that the taint of the illegal seizure had been attenuated.

After considering the totality of the circumstances, the Court finds the Government has not met its burden to prove a sufficient attenuation between the illegal seizure and the consent.  The

Court need not reach the question of whether Defendant's consent was voluntary because proving attenuation is a necessary component without which the evidence cannot be admitted.   The physical evidence obtained during Martinez's roadside search of the Chrysler must be suppressed.

### 2)   Defendant's Statements, Fingerprints, and Immigration A-File

Defendant argues his statements, fingerprints, and A-file should also be suppressed as fruits of an illegal detention and because the taint of the detention was not purged.[28]   The statements in question are those Defendant made "in response to Officer Martinez's actions in searching the Chrysler 300," Doc. 93 at 17, and his "custodial statements" at the Santa Fe Police Station following his arrest.  Doc. 93 at 19.

Importantly, Defendant's statements, fingerprints, and A-file were all obtained after the Fourth Amendment violation in this case.  That is, all were obtained after the officers unlawfully prolonged the traffic stop.   After showing that a detention violated a defendant's Fourth Amendment rights, then "[a]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).  The Defendant has shown that but for the unlawful prolongation, the statements would not exist.  This is so because had the officers ended the stop upon issuing the traffic citations rather than prolonging the stop by conducting an on-scene investigation unsupported by reasonable suspicion, Defendant would not have made either the roadside statements or the statements at the police station.  As a result, in order for the Government to show that the statements, fingerprints, and A-file are not fruit of the poisonous tree and that they should not be suppressed, it must show

---

[28] Defendant clarified at the hearing that he does not challenge the voluntariness of his statements.  Instead, he argues that the tainted evidence obtained after the illegal detention, including the statements, fingerprints, and evidence of his identity, cannot be attenuated.  Mot. Hr'g Tr. at 4:5-11.

that "the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

### a.   Defendant's Statements

Of the exclusionary rule exceptions, the only one brought to the Court's attention with regard to Defendant's statements is attenuation.[29]  The Government has not explicitly or implicitly argued for attenuation; it is Defendant who has brought the doctrine to the Court's attention. Neither the Government's brief nor its presentation at the hearing included any discussion of the *Brown* factors or argument as to how the Court should apply them here.  The Court cannot find the Government has met its burden to show that the evidence was "so attenuated from illegality as to the dissipate the taint of the unlawful conduct."   *United States v. Nava–Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).  The Court will suppress the statements made by Defendant.

### b.   Fingerprints and Alien-file

Lastly, Defendant moves for suppression of his fingerprints and immigration Alien-file ("A-file").  The United States argues there is no legal basis to suppress either.  Defendant maintains it is the Government's burden to show sufficient facts to purge the taint of the Fourth Amendment Violation, the Government has not applied the *Brown* factors, and even if it had, the "task for the United States is a difficult one" considering the *Brown* factors.  Doc. 106 at 14.

The Tenth Circuit has held that "if an illegal arrest was purposefully exploited for the objective of obtaining fingerprints, then the fingerprint evidence must be suppressed…Conversely, in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous

---

[29] Neither the briefing nor argument at hearing contain any reference to discovery through independent means.  The Government's inevitable discovery argument is limited to the contraband found in the vehicle. *See* Doc. 101 at 18.

tree." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1115 (10th Cir. 2006).  In these cases, the court must "determine the original purpose for arresting and later fingerprinting Defendant; that is, was Defendant fingerprinted merely as part of a routine booking or processing procedure or was the illegal arrest in part for the purpose of obtaining unauthorized fingerprints so Defendant could be connected to additional alleged illegal activity."  *Id.* at 1117.

To determine whether an A-file constitutes poisonous fruit and thus should be suppressed, *Olivares-Rangel* again provides instruction.  The answer,

> necessarily depends on whether Defendant's fingerprints, which the Government used to secure Defendant's A-file, should be suppressed. If the fingerprints are determined to be suppressible it will be because of a determination that the fingerprints were illegally obtained for the investigative purpose of obtaining Defendant's immigration record and potentially charging him with a more serious crime. Under such circumstances it seems to us that the A-file is inextricably linked to the fingerprints and if one is a fruit of the poisonous tree (the unconstitutional arrest), then the other is as well.

*Id.* at 1119.

Here, there is no evidence before this Court to support the Defendant's request to suppress the fingerprints or A-file.  There is nothing to suggest that Defendant's arrest was in any part for the purpose of obtaining his fingerprints.  Instead, his fingerprints were taken as part of a routine booking procedure.  Similarly, because the A-file is inextricably linked to the fingerprints and because the fingerprints are not suppressible here, the A-file will not be suppressed.

### D.  The Inevitable Discovery Rule Does Not Apply Here.

The final question in this case is whether the inevitable discovery doctrine should apply so as to save the physical evidence obtained from Defendant's vehicle from suppression despite the Fourth Amendment violation.   As discussed above, subject to certain exceptions, the exclusionary rule requires that evidence obtained in violation of the Fourth Amendment must be suppressed. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir.2005).  The inevitable discovery

doctrine is one exception to the rule. *Id.* Under the doctrine, "illegally obtained evidence may be admitted if it ultimately or inevitably would have been discovered by lawful means." *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) (internal quotation marks and citation omitted); *see also United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000) ("Although a search may violate the Fourth Amendment, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means."). It is the government's burden to prove by a preponderance of the evidence that the evidence in question "would have been discovered without the Fourth Amendment violation." *Cunningham*, 413 F.3d at 1203.

The Government argues that even if the Court finds a Fourth Amendment violation here, suppression is not warranted because the evidence "would have been inevitably discovered during an inventory search of the vehicle." Doc. 101 at 18. "An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment." *United States v. Haro–Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). The search is "an administrative procedure designed to produce an inventory" of a defendant's belongings. *Id*. at 773. Inventory searches "are not treated as investigative searches because they serve three administrative purposes: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003). "In regard to roadside car searches, if evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." *United States v. Martinez*, 512 F.3d 1268, 1273 (10th Cir. 2008) (internal quotation marks, brackets, and citation omitted); *see also United States v. Neugin*, 958 F.3d 924, 932 (10th Cir. 2020) ("The government may carry its burden by showing

that if police officers had not violated the Fourth Amendment, they still would have discovered the evidence through a lawful inventory search of the car.") (citation omitted).

The Court finds that the Government has not met its burden to prove by a preponderance of the evidence that the police would have inevitably discovered the evidence at issue in this case without the Fourth Amendment violation.  The Government argues that officers "*could*" have towed the car and conducted an inventory search.  Doc. 101 at 21 ("vehicle *could* have been towed due to the lack of valid registration, … Santa Fe Police Department's policy *allows* for towing of vehicles from public roadways." (emphases added).  *See* Santa Fe Police Department Tow Policy, Govt.'s Ex. 6.   But the Government has not shown that it was inevitable the vehicle would indeed have been impounded.  In other words, the Government's request is based on a highly speculative assumption of inevitably, which is insufficient for the exception to apply.  *See United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) ("In determining whether the government has met its burden of proof, we consider 'demonstrated historical facts,' not 'speculative elements.'") (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)); *accord United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986) ("[T]he inevitable discovery exception to the exclusionary rule cannot be invoked because of [a] highly speculative assumption of 'inevitability.'").

Both Officer Martinez and Montijo testified that vehicles are not inevitably towed whenever a driver's registration is suspended.  Officer Martinez testified that he has given other tickets for suspended registration or failure to exhibit proof of valid insurance, [30] but that whether the vehicle gets towed in those cases "[j]ust depends.  It's officer discretion, I think."   Mot. Hr'g Tr. at 59:2-6.  He testified that he was trained on SFPD's towing policy.  *See* Mot Hr'g Tr. at 51:1-

---

[30] The number of prior tickets is unclear.  When asked to estimate how many such tickets he has given out, Officer Martinez testified somewhat confusingly, "I could not put a number on it.  It would be numerous.  I issued several." Mot. Hr'g Tr. at 58:16-20.

6.   Though he testified on direct examination that he "believe[d]" he would have towed Defendant's vehicle, he testified later that suspended registration does *not* compel an officer to tow the vehicle.  *Id*. at 64:6-11.  He also testified that he believed the reason Officer Montijo had not towed Defendant's vehicle during a prior stop, a stop Martinez believed involved suspended registration, was because,

> [i]n that instance, the Defendant took it upon himself to make phone calls prior to that…The Defendant made phone calls prior to or during the traffic stop, so that somebody would arrive on-scene…But I think what had played out in that situation is somebody had arrived before Officer Montijo could even make that decision to tow the car, where somebody was already there.  And sometimes in patrol, we have other calls we have to respond to.  We have important thinks to do.  And sometimes circumstances play out that if it's easier in that situation and somebody shows up, like the Defendant had already kind of rolled it in motion, maybe that…

*Id*. 63:6-18.[31]  Finally, Officer Martinez testified that he told Officer Montijo that if the driver did not consent to a search, he would tow the vehicle.  *See id.* at 106:2-4.  However, Officer Martinez did not decide to tow the car at that time -- while he claimed he "could have" towed the Chrysler, he "couldn't say why" he did not tow it, and "[t]'s just a decision that I made." *Id*. at 106:15-22.

When Officer Montijo was asked whether he had had cases where the registration was invalid yet the vehicle was not towed, he said, "I mean, I'm sure," though he did not recall a specific case at the time of his testimony.  *Id*. at 145:21-24.  Significantly, Officer Montijo also testified that the SFPD tow policy does not require officers to tow a vehicle in all cases where there is inadequate registration.  *See id.* at 145:25-146:1-2.

The Government focuses on whether impoundment would be justified under five non-exclusive factors described in *United States v. Sanders,* 796 F.3d 1241, 1250 (10th Cir. 2015), that asks "whether impoundment was justified by a reasonable, non-pretextual community

---

[31] Officer Montijo later testified the prior stop did not involve suspended registration, but that does not change the importance of Martinez's testimony here.  From Martinez' statement, the Court infers that Martinez' decision making of whether to impound a vehicle was guided by discretion, not standard police policies.

caretaking rationale." Doc. 101 at 18-19.  However, the Government's argument is misplaced. The question here is not whether the impoundment of the Chrysler was reasonable.  The question is whether it was inevitable that the Chrysler would be impounded and then inventoried.

In sum, the Government has not shown that the officers would have discovered the narcotics and firearm if they had not unlawfully prolonged the stop during their strategy discussion without reasonable suspicion in violation of the Fourth Amendment.  *See United States v. Neugin,* 958 F.3d 924, 935 (10th Cir. 2020) (declining to apply inevitable discovery doctrine where government did not show that impoundment and inventory search inevitably would have occurred without officer's violation of Fourth Amendment).  The Government has not proven that if the officers had not had that discussion about how to get inside the vehicle, the officers would inevitably have impounded and searched the Chrysler.  Particularly in light of the fact that both officers testified that the SFPD policy does not compel them to impound a vehicle whenever the registration is suspended, the inevitably of impoundment is too speculative in this case.  As a result, the Court finds the Government has not met its burden to show the evidence would have inevitably been discovered without the Fourth Amendment violation.

### IV.
### CONCLUSION

For all of the reasons stated above, the Court will suppress the physical evidence obtained from the Chrysler and Defendant's statements.  However, the Court will not suppress Defendant's fingerprints or A-file.  **IT IS THEREFORE ORDERED** that Defendant's Opposed Motion to Suppress Evidence (Doc. 93) is **GRANTED IN PART AND DENIED IN PART.**

DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE